## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JACK GALARDI, RED EYED, INC.
d/b/a CRAZY HORSE SALOON,
WALLEYE, LLC, MIA LUNA, INC.
d/b/a PINK PONY SOUTH, and
JGP&P, LLC

                Plaintiffs,

v.

CIVIL ACTION FILE
NO. 1:12-CV-531

CITY OF FOREST PARK, and
CORINE DEYTON, SPARKLE
ADAMS, MAUDIE McCORD,
LINDA LORD, and JOHN PARKER,
individually.

                Defendants.

## I.     INTRODUCTION

This case is about property rights and Defendants' calculated campaign to deprive Plaintiffs of any and all value in their property—not about the nature of the businesses conducted on the properties.  Three years ago, Defendants launched a no-holds-barred crusade to wipe out two existing adult entertainment establishments (the "Businesses") that were operating lawfully in the City of Forest Park (the "City").  Beginning in March 2009, the individual Defendants used their positions as City officials to pass a series of laws aimed at exterminating these

Businesses.  Defendants singled out the Businesses for discriminatory enforcement of both new and existing laws.  The undeniable result of these efforts was the complete and total elimination of any economic value in the two properties on which those businesses sit.

In January 2012, Defendants finally succeeded in shutting down the Businesses.  Along the way, Defendants employed laser-targeted legislation, selective and abusive enforcement, and a wholesale disregard for Plaintiffs' civil rights.  In particular, Defendants violated Plaintiffs' equal protection rights by intentionally treating Plaintiffs differently from every other similarly situated business and property owner in the City.  Defendants also deprived Plaintiffs of their vested rights to use their property, in which Plaintiffs have invested millions of dollars, without due process and without compensation.  In fact, under the circumstances, Defendants left the properties worthless.

Plaintiffs are entitled to compensation for Defendants' violations of their rights.  In the alternative, Plaintiffs are entitled to a combination of compensation and an order returning Plaintiffs to the *status quo ante* wherein they can use their property in accordance with their vested rights.

Importantly, Defendants do not deny that they regulated the Businesses out of business.  Rather, they argue that Plaintiffs failed to plead properly their claims

and that such claims are barred by certain procedural defenses.  In response, Plaintiffs are voluntarily dismissing the only actually flawed claims of the Complaint, a section of Count I and Count IV.  The remaining counts and claims are viable, cognizable and competent claims that, for the reasons set for the below, state plausible claims for relief and more than survive Defendants' motion to dismiss.[1]

## II.   RELEVANT BACKGROUND

### A.   In reliance on Defendants' assurances and conduct, Plaintiffs' invested more than $7.8 million in lawful adult entertainment establishments.

Until January 15, 2012, Plaintiffs Red Eyed, Inc. d/b/a Crazy Horse Saloon ("Red Eyed") and Mia Luna, Inc. d/b/a Pink Pony South ("Mia Luna") operated businesses on properties owned by Wall Eye, LLC ("Walleye") and JGP&P, LLC ("JGP&P") respectively.  Red Eyed began lawful operations in the City in 1993 as an adult entertainment establishment with nude dancing, alcohol service and booths.  (Compl. ¶ 16.)  In 2007, Red Eyed relocated to its present location at 3920 Jonesboro Road (the "Jonesboro Road Property").  (Compl. ¶¶ 26, 29.)  Mia Luna began lawful operations in the City as an adult entertainment establishment with

---

[1] Out of an abundance of caution and to reflect the voluntary dismissal, Plaintiffs filed contemporaneously herewith an Amended Complaint.

nude dancing, alcohol service and booths in 2003 at property located at 4730 Frontage Road (the "Frontage Road Property").  (Compl. ¶¶ 20, 25.)

Before Plaintiffs invested in the Jonesboro Road and Frontage Road Properties (the "Properties"), they obtained agreements and assurances from Defendants that the Properties could be used as adult entertainment establishments with nude dancing, alcohol service and booths.  (Compl. ¶¶ 17-30.)  In reliance on Defendants' assurances and conduct, Walleye invested $1,000,000 to purchase and improve the Jonesboro Road Property, and Red Eyed and Jack Galardi spent in excess of $1,250,000 to establish and operate an adult entertainment establishment on the property.  (Compl. ¶¶ 27, 29.)  Similarly, in reliance on Defendants' assurances and conduct, JGP&P invested $2,000,000 to purchase and improve the Frontage Road Property, and Mia Luna and Jack Galardi invested more than $3,600,000 to establish and operate an adult entertainment establishment on the property.  (Compl. ¶¶ 23, 25.)

**B.     After Plaintiffs invested millions of dollars, Defendants began a campaign to eradicate the businesses and deprive the property owners of all value in their properties.**

In 2008, the City elected a new mayor and two new City council members. (Compl. ¶ 31.)  Almost immediately after the new officials took office, the City, apparently motived by the new officials' personal distaste and animus toward adult

entertainment establishments, began passing legislation aimed at shutting down Red Eyed's and Mia Luna's businesses (together, the "Businesses") and selectively enforcing certain laws against the Businesses. (Compl. ¶¶ 32, 183.) Defendants' intentional discriminatory conduct toward Plaintiffs was willful and malicious and undertaken with actual intent to injure Plaintiffs. (Am. Compl. ¶ 15.)

## 1. Defendants passed legislation that deprived Plaintiffs of the use of the Properties as adult entertainment establishments with nude dancing, alcohol service and booths.

Defendants first attacked the Businesses by revising the City's adult entertainment code to, among other things, prohibit the sale or consumption of alcohol at businesses that offered nude dancing and ban the use of booths at those establishments. (Compl. ¶ 33.) The new law was inconsistent with certain agreements between Plaintiffs. (Compl. ¶¶ 19, 22.) The new law was also inconsistent with City-issued zoning verifications and building permits for the Properties. (Compl. ¶¶ 20, 24, 26, 28.) Unconcerned with its own prior conduct and agreements, in December 2010, the City refused to renew the Businesses' adult entertainment licenses based on allegations that the Businesses used booths. (Compl. ¶ 38.) Therefore, the Businesses began operating as "bikini bars". (Compl. ¶ 38.)

## 2. Defendants passed legislation to drive Red Eyed and Mia Luna completely out of business.

Not satisfied that they forced Red Eyed and Mia Luna (the "Operators") to operate the Businesses as bikini bars, Defendants devised a plan to completely shut down the Businesses.  The first phase of this plan was to do whatever it took to create plausible allegations of unlawful conduct at the Businesses.  In January 2011, the City began selectively and aggressively enforcing the City's former Alcohol Code against the Operators and used the Police Department's investigation of a fight in the ladies room at Crazy Horse to illegally seize computer equipment and videotapes.  (Compl. ¶¶ 39-46.)

After the City purportedly found evidence of unlawful conduct at the business premises, Defendants crafted additional legislation that it knew would shut down the Businesses. In May 2011, Defendants passed an ordinance giving the City power to suspend or revoke City-issued licenses where the City learned of unlawful conduct and almost immediately used the new law to revoke the Operators' business and alcohol licenses.  (Compl. ¶¶ 47, 48, 51-55.)

Then, on the same day the City revoked the Operators' licenses, Defendants again tailored legislation specifically targeting Plaintiffs.  This time, the Defendants amended City licensing laws to add grounds for non-renewing licenses if the applicant had any license revoked in the last 12 months or if the City had evidence that the applicant allowed unlawful activity at the business premises.

(Compl. ¶¶ 58.)   The City discriminatorily applied these new grounds for non-renewal and the long-standing ground of unpaid City taxes only to the Operators. (Compl. ¶¶ 60-73.)   As a result of Defendants' unique treatment of Plaintiffs, the City refused to renew the Business Licenses.   Finally, in January 2012, nearly three years after Defendants embarked on their campaign against Plaintiffs, Defendants forced the Businesses to close.   (Compl. ¶¶ 74-75.)   The Properties now have no viable economic use.   (Am. Compl. ¶ 86.)   Accordingly, Defendants' conduct deprived Plaintiffs of all economic value of the Properties and the Businesses.

### III.   ARGUMENT AND CITATION OF AUTHORITY

#### A.   Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 8(a)(2), a pleading demands more than unadorned accusations, but *does not require* detailed factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Thus, a complaint should be dismissed for failure to state a claim only where it appears that the facts alleged fail to state a "plausible" claim for relief. Id.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.   "In ruling on a motion to dismiss, the court must accept factual allegations as true and construe them in the light most favorable to the

plaintiff." <u>Cooke v. BAC Home Loans Servicing, LP</u>, 1:11-CV-2126-TWT, 2012 WL 181605 (N.D. Ga. Jan. 20, 2012).

Defendants demand far more at the pleading stage than is required under <u>Iqbal</u>. Contrary to Defendants' contentions, the factual allegations in the Complaint more than satisfy the relevant pleading requirements. Nonetheless, out of an abundance of caution, Plaintiffs are filing an Amended Complaint contemporaneously herewith that more than cures the alleged pleading defects.

**B.    Plaintiffs' claims are not barred by collateral estoppel.**

Defendants improperly contend that a previous order from the Eleventh Circuit bars these claims. In the 2009 Litigation brought by the Operators, the Eleventh Circuit held that the Operators lacked standing to bring their claims. This holding does not bar the pending litigation. First, Plaintiffs have standing to bring the pending claims. Second, the Defendants' argument that the standing ruling in the previous lawsuit is binding here is a red herring and is not true.

**1.  Plaintiffs have standing to assert their claims.**

Plaintiffs have standing to assert the claims filed in this litigation. To establish standing, Plaintiffs must show: "1) an injury in fact, meaning an injury that is concrete and particularized, and actual or imminent, 2) a causal connection between the injury and the casual conduct, and 3) a likelihood that the injury will

be redressed by a favorable decision." CAMP Legal Defense Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting Granite State Outdoor Adver., Inc. v. City of Clearwater, 351 F.3d 1112, 1116 (11th Cir. 2003)).  At the pleading stage, the plaintiff satisfies this burden with "general factual allegations of injury resulting from the defendant's conduct." Id.  Plaintiffs' Complaint states sufficient factual allegations to support standing for each of its causes of action.

To satisfy the first element, the plaintiff must show he or she has personally suffered an actual or threatened injury. Id. (quoting Granite State Outdoor Adver., Inc. v. City of Clearwater, 351 F.3d 1112, 1117 (11th Cir. 2003)).  With respect to a takings claim, the property owner at the time of the taking has standing to bring suit and recover compensation.  See Palazzolo v. Rhode Island, 533 U.S. 606, 628 (2001).  To establish redressability, the plaintiff must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (internal quotation marks omitted).  The Court's ability to award damages for the injury establishes redressability.  See Roma Outdoor Creations, Inc. v. City of Cumming, Ga., 599 F.Supp. 2d 1332 (N.D. Ga. 2009)(citing Covenant Media of S.C., LLC v. City of N. Charleston, 493 F.3d 421, 428 (4th Cir. 2007)).

In the pending action, Plaintiffs have standing to assert their claims under 42 U.S.C. § 1983 and for violations of the Georgia Constitution.  The alleged facts establish that Defendants' conduct injured Plaintiffs. Specifically, the Complaint alleges that the City: (1) passed ordinances to regulate the Operators out of business (Complaint ¶¶ 80, 81, 126); (2) aggressively enforced its former alcohol code against the Operators (Complaint ¶¶ 82, 126); (3) treated the Operators differently by non-renewing the Business Licenses without providing 10 days notice to pay outstanding taxes and based on alleged instances of unlawful conduct (Complaint ¶¶ 83, 84); (4) deprived Walleye and JGP&P (the "Property Owners") of their vested rights to use the Properties as adult entertainment establishments or alternatively for commercial business purposes (Complaint ¶¶ 91, 92, 93, 94, 101-107, 130-137, 141-148); and (5) denied the Plaintiffs property rights without due process of law (Complaint ¶¶ 113-122; 151-155).  Importantly, the Court may award monetary damages to compensate Plaintiffs for their injuries.  This alone establishes redressability.  Moreover, the Court may return the parties to the *status quo ante* wherein the Plaintiffs are entitled to use the Properties in accordance with their vested rights.  As a result, Plaintiffs have standing to bring these claims.

The Property Owners also have standing to bring their inverse condemnation claim.  <u>Palazzolo</u>, 533 U.S. at 628. As the Court in <u>Palazzolo</u> explained, the

property owner at the time of the taking has standing to bring a claim and is entitled to compensation for the taking.  In this case, Plaintiff Walleye owns the Jonesboro Road Property on which Red Eyed operated its business and JGP&P owns the Frontage Road Property on which Mia Luna operated its business. (Complaint ¶¶ 4-5.)  As a result, these Plaintiffs have standing to bring an inverse condemnation claim and seek damages as a result of the City's improper taking.

**2.  Defendant's collateral estoppel argument is a red herring.**

Defendants argue that the issue of standing was adjudicated previously in the 2009 Litigation and the pending claims are therefore precluded under the collateral estoppel doctrine.  To claim collateral estoppel, Defendants must show: 1) the issue in the pending litigation is identical to the one involved in the prior proceeding; 2) the issues was actually litigation in the prior proceeding; 3) the determination of the issue in the prior proceeding was a critical and necessary party of the judgment and 4) the party against whom the doctrine is asserted must have had a full and fair opportunity to litigation the issue.  Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1359 (11th Cir. 1998).  Defendants' argument misses the mark for two reasons.  First, Plaintiffs' claims in the pending litigation are different than those previously brought and, in fact, could not have been asserted in the previous litigation.  Moreover, as explained above, the present claims do not suffer

from the same standing problems.  Second, the issues addressed in the Eleventh Circuit's opinion are not applicable to the current case.

### a. The pending lawsuit addresses different claims and facts that did not exist and were not adjudicated in the 2009 Litigation.

Defendants' collateral estoppel argument fails because the issues at stake in the 2009 Litigation are not the same as those in the pending litigation and the facts are not identical.  It is true that both cases involve *some* of the same factual allegations.  However, since the 2009 case was adjudicated, Defendants committed additional civil rights violations that Plaintiffs now have a right to redress.  For example, since the previous case was adjudicated, Defendants: (1) conducted sham hearings to revoke the Operators' alcohol and business licenses; (2) passed additional legislation targeting Plaintiffs; and (3) non-renewed the Business Licenses, thereby depriving the Property Owners of all reasonable economic value of the Properties.

Moreover, the causes of action and redress sought are completely different. The 2009 Litigation challenged the validity and enforceability of certain aspects of the City's Adult Entertainment Ordinance.   The pending litigation, however, challenges Defendants' discriminatory and malicious course of conduct that drove the Operators out of business and that deprived Plaintiffs of constitutionally protected equal protection, due process and property rights.

Any standing issues that existed in the 2009 Litigation have been corrected. A dismissal for lack of standing is not an adjudication on the merits, and the dismissal permits a second action on the same claim that corrects the deficiency found in the first action. N. Ga. Elec. Membership Corp. v. City of Calhoun, Ga., 989 F.2d 429, 433 (11th Cir. 1993). In North Georgia Electric, the court held that standing could not be re-litigated when no facts had changed from when the first lawsuit was dismissed for lack of standing. Id. The present case is easily distinguishable from North Georgia Electric. Specifically, since the standing issue was adjudicated, Defendants took additional actions against Plaintiffs that resulted in the non-renewal of the Operators' business licenses and the complete loss of all economically viable use of the Properties.

### b. The Eleventh Circuit's holding in the 2009 Litigation is not applicable to the pending lawsuit.

The lack of redressability argument that fueled the Eleventh Circuit's order in the 2009 Litigation does not exist in this lawsuit. In the 2009 Litigation, the plaintiffs challenged certain aspects of the City's adult entertainment ordinance as unconstitutional, but did not challenge the Ordinance's prohibition regarding private booths and rooms. See Eleventh Circuit's October 18, 2011 Order (the "Order") p. 2-3. The City denied the Operators' adult entertainment licenses for 2011 based on the Businesses' use of private booths. As a result, the Eleventh

Circuit found that even if it were to rule in appellant's favor on all issues raised, the appellants would still be unable to engage in adult entertainment based on the private booth provision they did not challenge.  Order p. 3-4.  The Eleventh Circuit therefore held that the appellants could not establish redressability and lacked standing to sue.  Order p. 4-5.

The pending litigation cures any standing problems that existed before. Notably, Plaintiffs do not base any claims solely on the non-renewal of the Operators' adult entertainment licenses.  Rather, Plaintiffs allege the Defendants violated Plaintiffs' civil rights as a result of a three-year course of conduct that culminated with the forced shut down of the Businesses.  As a result, if the Court finds favorably on Plaintiffs' claims, the Operators can re-open their Businesses. Furthermore, as explained above, the Complaint establishes a right to monetary damages, which establishes redressability.

**C.    Plaintiffs' Claims are not Barred by Res Judicata.**

Defendants' motion appears to suffer from a fundamental misunderstanding about Plaintiffs' claims, which drives the majority of their arguments.  Plaintiffs have never before litigated the pending claims.  The fact that Plaintiffs cited facts that were alleged in a previous lawsuit does not trigger res judicata.  Defendants base their res judicata arguments on the dismissal of two petitions for writ of

certiorari (Case Nos. 2011-CV-464 and 2011-CV-465) (collectively, the "2011 Writ Petitions") as having a preclusive affect on the pending litigation. This argument fails because the 2011 Writ Petitions did not adjudicate the same claims pending herein. In fact, some of the facts related to the Business Licenses had not yet occurred when the 2011 Writ Petitions were adjudicated. In addition, and maybe most importantly, the 2011 Writ Petitions did not involve the same parties as this litigation.

**1. The 2011 Writ Petitions did not adjudicate the claims pending in this action.**

When deciding if an earlier claim precludes a second claim, the court must first determine "whether the wrong for which redress is sought is the same in both actions." Daley v. Marriott Intern., Inc., 415 F.3d 889, 895-96 (8th Cir. 2005) (quoting Roach v. Teamsters Local Union No. 688, 595 F.2d 446, 449 (8th Cir. 1979)).

In this case, the 2011 Writ Petitions and the pending litigation share a few common facts, but seek to address different wrongs, different harms and include claims that were not originally available in the 2011 Writ Petitions. Specifically, the claims in this case arise out of a body of facts that includes Defendants' non-renewal of the Business Licenses, which did not occur until well after the 2011 Writ Petitions were adjudicated.

In addition, the 2011 Writ Petitions were narrow statutory appeals explicitly limited by law in scope and breadth brought pursuant to O.C.G.A. § 5-4-1. This is a mechanism under Georgia law whereby a citizen can challenge a governing authority's license revocation. The scope of this procedure is narrow—there is no discovery, no extrinsic evidence allowed, and the court considers only errors of law and determines whether the decision is sustained by substantial evidence. O.C.G.A. § 5-4-12(b). Thus, the 2011 Writ Petitions <u>only</u> addressed whether the City acted properly when it non-renewed the Businesses' adult entertainment licenses. The pending litigation, however, is not so limited. Instead, the pending litigation is based on the City's course of conduct, which seeks damages not only the non-renewal of the adult entertainment licenses, but also the City's non-renewal of the Business Licenses. As a result, the adjudication of the 2011 Writ Petitions does not preclude the pending claims.

**2. The 2011 Writ Petitions did not involve the same parties as the Plaintiffs herein.**

In addition to adjudicating the same cause of action, the doctrine of res judicata will not apply unless the two actions involve the same parties or their privies. <u>See</u> <u>Daley v. Marriott Intern., Inc.</u>, 415 F.3d 889, 895-96 (8th Cir. 2005). This reflects a "deep-rooted historic tradition that everyone should have his own

day in court." <u>EEOC v. Pemco Aeroplex, Inc.</u>, 383 F.3d 1280, 1286 (11th Cir. 2004) (citing <u>Richards v. Jefferson County, Ala.</u>, 517 U.S. 793, 798 (1996)).

There is no question that the Property Owners were not parties to the 2011 Writ Petitions.  As explained above, the 2011 Writ Petitions were brought on behalf of the Operators and challenged the City's ability to non-renew their adult entertainment licenses.

Importantly, the Property Owners had no interest in the 2011 Writ Petitions and their rights and damages were not adjudicated by those appeals.  In this case, the Property Owners assert that Defendants' conduct has deprived them of their property rights and amounts to a taking in violation of the Fifth Amendment of the United States Constitution and Article I, Section III, Paragraph I of the Georgia Constitution.  These claims were not adjudicated by the 2011 Writ Petitions nor could they have been because Defendants had not yet caused a complete taking at that time.  The patient was not yet pronounced dead.

Defendants attempt to circumvent this fact by stating, without citing to any factual or legal authority, that the "shell corporations utilized solely to own the real property underlying the clubs are clearly privies of the other plaintiffs herein." (Def.'s Br., 19.)  There is absolutely no allegation nor evidence to this effect. Federal courts have held two parties to be in privity with one another for res

judicata purposes "where the nonparty has succeeded to the party's interest in property, where the nonparty controlled the original suit, where the nonparty's interest were represented adequately by the party in the original suit, and where the party and nonparty have concurrent interest in the same property right." Hart v. Yamaha-Parts Distributors, Inc., 787 F.2d 1468 (11th Cir. 1986) (holding that trial court erred in finding privity between a stockholder and corporation when there was no evidence that the two entities operated as one unit) (internal quotations and citations omitted).

In this case, the Property Owners are not privies of the Operators.   The Property Owners are not successors-in-interest to the Businesses; they did not control the original suit; the Operators did not adequately represent their interest in the 2011 Writ Petitions, and the parties did not have concurrent interest in the same property rights.   There is absolutely no allegation, much less evidence, before this Court suggesting that it can pierce the corporate veils of the Operators or the Property Owners.   Because the Property Owners were not parties to the 2011 Writ Petitions, res judicata does not bar the pending claims.

**D.   Plaintiffs Stated a Valid Equal Protection Claim under Both Federal and Georgia Law.**

      **1. To state an equal protection claim, Plaintiff must allege that Defendants treated Plaintiffs differently from similarly situated individuals for a discriminatory purpose.**

Individuals have a right to be free from intentional discrimination at the hands of government officials. Campbell v. Rainbow City, Alabama, 434 F.3d 1306 (11th Cir. 2006). This freedom is guaranteed through the Fourteenth Amendment which "secure[s] every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074-75, 145 L. Ed. 2d 1060 (2000). The Georgia Constitution confers equal protection rights coextensive with the Federal Constitution. Ambles v. State, 259 Ga. 406, 407, 383 S.E.2d 555, 557 (1989).

Intentionally discriminatory application of a facially neutral statute violates the Equal Protection Clause. Strickland v. Alderman, 74 F.3d 260, 264 (11th Cir. 1996); Mackenzie v. City of Rockledge, 920 F.2d 1554, 1559 (11th Cir. 1991). Even a "class of one" can succeed in an equal protection claim by showing: "(1) that he was treated differently from other similarly situated individuals, and (2) that the defendant unequally applied a facially neutral ordinance for the purpose of discriminating against him." Leib v. Hillsborough County Public. Transp. Comm'n, 558 F.3d 1301, 1307 (11th Cir. 2009). In this regard, an individual is "similarly situated" to the plaintiff if he is similar to the plaintiff in all *relevant*

respects.   Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1204 (11th Cir. 2007) (emphasis added).

### a.   Plaintiffs alleged that Defendants treated Plaintiffs differently from similarly situated individuals.

The Complaint's allegations of discriminatory conduct are sufficient to establish Plaintiffs' equal protection claim.  The Complaint alleges that Defendants crafted legislation that directly targeted the Operators (Compl. ¶¶ 32, 47-50, 58-59, 80, 81, 126) and selectively enforced City ordinances against them (Compl. ¶¶ 39, 82, 126).  Moreover, Defendants non-renewed the Operators' Business Licenses while it granted licenses to similarly situated businesses. (Compl. ¶¶ 63, 64, 65, 66, 83, 84, 126).  Both grounds on which the City non-renewed the Business Licenses demonstrate unequal treatment.  To the extent, if any, that the Complaint does not specifically allege that Defendants' discriminatory conduct was intentional and motivated by ill-will, such omission is not fatal as the Court can reasonably infer such intent and ill-will from the facts alleged.  Nonetheless, out of an abundance of caution, Plaintiffs' Amended Complaint filed contemporaneously herewith explicitly alleges Defendants' intent and ill-will. (Am. Compl. ¶¶ 100.)

For example, the City claims it non-renewed the Business Licenses because Plaintiffs owed taxes to the City.  For this decision, the Operators are similarly situated to other business license applicants that owed City taxes when they filed

for renewal.  It is the City's policy and practice to provide an applicant notice and ten (10) days to pay outstanding taxes before denying a business license application for non-payment of taxes.  (Compl. ¶ 63.)  Despite this policy, the City did not notify the Operators or provide them an opportunity to pay outstanding taxes before the City denied the Operators' applications.  (Compl. ¶ 64.)  This lack of notice and opportunity to cure was unique to the Operators.  (See Compl. Ex. E at 54:20-25.)

The City also claims it denied the Operators' business license applications based on information concerning alleged unlawful conduct at their business premises.  (Compl. ¶ 61.)  The relevant factor in this decision is whether the City had evidence of unlawful activity at the applicant's business location.  That is, with regard to the City's license renewal decision, two applicants are similarly situated if the City has evidence of unlawful activity at each applicant's business.  Plaintiffs' complaint alleges that the Operators were treated differently from a similarly situated applicant because the City renewed the business license of a business that City police cited for having illegal gaming machines and illegal gambling on the premises while it denied the Operators' applications based on alleged unlawful conduct.  (Compl. ¶¶ 61, 66.)

       **b.   Plaintiffs alleged that Defendants applied the Non-Renewal Ordinance unequally in order to discriminate against them.**

The Complaint's allegations also satisfy the requirements of the second prong of the "class of one" equal protection test. Plaintiffs allege throughout the Complaint that Defendants' conduct was motivated by the individual Defendants' animus toward Plaintiffs' businesses and carried out to strip the Properties of any and all value. Such animus is demonstrated through Defendants' three-year campaign of enacting and enforcing legislation with the intent and effect of regulating the Operators out of business. (Compl. ¶¶ 33-75.) Considering the Complaint's allegations as true, the Complaint shows that the City applied licensing requirements unequally to the Operators as compared with others for the discriminatory purpose of shutting them down. (Id.) Under Iqbal, a claim is facially plausible if it allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. Unless Defendants can show another business that has recently been the target of a similar campaign or that the City literally regulated out of business, the Court may reasonably infer from the Complaint's allegations that Defendants intentionally discriminated against Plaintiffs. Nonetheless, to dispel all doubt, the Amended Complaint specifically alleges that Defendants intentionally applied the non-renewal laws in a discriminatory manner. (Am. Compl. ¶¶ 91-100.)

## 2. The Complaint alleges sufficient facts to satisfy federal pleading requirements.

Defendants incorrectly argue that Plaintiffs' allegations somehow fall short of the pleading requirements set forth in Iqbal.  Plaintiffs alleged that Defendants treated them differently from other similarly situated individuals by not providing the Operators notice and an opportunity to pay outstanding taxes before denying their license renewal applications.  (Compl. ¶¶ 63-65, 83.)  In addition, Plaintiffs alleged that Defendants treated them differently by denying the license applications for alleged unlawful conduct while it granted a license to another business where the City knew of illegal activity.  (Compl. ¶¶ 66, 84.)  Plaintiffs further alleged that Defendants, motivated by the individual Defendants' personal animus toward Plaintiffs, crafted and enforced legislation for the purpose of shutting down Plaintiffs' businesses.  (Compl. ¶¶ 80.)  Taking these allegations as true, the Court can draw the reasonable inference that Defendants violated Plaintiffs' equal protection rights.

Defendants also incorrectly argue that Plaintiffs' equal protection claims fail because Plaintiffs did not identify a comparator by name or category.  (Def.'s Br., 26-27.)  Plaintiffs are not required to name specific comparators.  In the case cited by Defendants, GJR Invest., Inc. v. County of Escambia Fla., 132 F.3d 1359 (11th Cir. 1998), the Eleventh Circuit Court of Appeals held that the trial court erred in finding an equal protection claim where "[t]he words 'equal protection' do

not appear *anywhere* in the complaint."  132 F.3d at 1367 (emphasis in original).

The GJR court further held that the plaintiff failed to state an equal protection

claim because it did not even attempt to show that it was similarly situated to

others who were treated differently. Id.  The present case suffers from neither

defect.  (Compl. ¶¶ 63-66.)  Thus, the Complaint's allegations of unequal treatment

are in all ways sufficient.  Nonetheless, out of an abundance of caution, Plaintiffs

are filing an Amended Complaint contemporaneously herewith that cures the

alleged pleading defect by naming at least one specific comparator.  (Am. Compl.

¶ 99.)  As the Complaint satisfies all requirements necessary to plead an equal

protection claim, this Court should deny Defendants' Motion.

**E.      The Complaint States an Actionable Georgia Substantive Due Process
         Claim.**

Substantive due process protects against government power arbitrarily and

oppressively exercised.  City of Duluth v. Morgan, 287 Ga. App. 322, 324, 651

S.E.2d 475, 477 (2007).  "When a fundamental right is allegedly infringed by

government action, substantive due process requires that the infringement be

narrowly tailored to serve a compelling state interest."  Old S. Duck Tours v.

Mayor & Aldermen of City of Savannah, 272 Ga. 869, 872, 535 S.E.2d 751, 754

(2000).

**1.     Defendants' conduct infringed on Plaintiffs' fundamental property rights.**

The Property Owners in this case had vested property rights in the two Properties. Defendant deprived them of this fundamental right without due process of law. Under Georgia law, a property owner that acts in reliance on government assurances and conduct may acquire vested property rights. Barker v. County of Forsyth, 248 Ga. 73, 281 S.E.2d 549 (1981). In Barker, the Georgia Supreme Court held that a property owner who substantially changed his position in reliance on existing zoning ordinances and zoning officials' assurances that the county would issue a building permit acquired a vested right in the permit notwithstanding subsequent changes in the county's zoning ordinances that would have precluded issuance of the permit. 248 Ga. at 76, 281 S.E.2d at 552. Following Barker, Georgia courts adopted the general rule that a property owner acquires a vested right to a land use notwithstanding a subsequent change in zoning, if the property owner, in good faith, made a substantial change in position in relation to the land, made substantial expenditures, or incurred substantial obligation. Meeks v. City of Buford, 275 Ga. 585, 587, 571 s.E.2d 369, 371 (2002).

Here, the Property Owners changed their position and invested millions of dollars in good-faith reliance on the City's zoning ordinances, assurances and conduct. (Compl. ¶¶ 23, 27.) Specifically, Walleye spent $1,000,000 to purchase

and improve the Jonesboro Road Property for use as an adult entertainment establishment with nude dancing, alcohol service and booths in reliance on the 1997 Settlement Agreement and the zoning verification issued for the property. (Compl. ¶ 27.)  Similarly, in reliance on the 2004 Settlement Agreement and the zoning verification issued for the Frontage Road Property, JGP&P spent $2,000,000 to purchase and improve that property for use as an adult entertainment establishment with nude dancing, alcohol service and booths.  (Compl. ¶ 23.) Thus, the Property Owners acquired vested rights to use the Properties as adult entertainment establishments with nude dancing, alcohol service and booths.

The Operators also invested substantial sums in reliance on the City's assurances and conduct.  In reliance on the 1997 Settlement Agreement, the 2004 Settlement Agreement and the zoning certifications and building permits issued by the City, Jack Galardi, Red Eyed and Mia Luna spend in excess of $4.8 million to renovate the Properties for use as adult entertainment establishments with nude dancing, alcohol service and booths. (Compl. ¶¶ 25, 29.)  Georgia courts have not addressed whether tenants acquire vested property rights in the same manner as Property Owners.  However, the logic for obtaining vested rights based on a change in position and substantial expenditure appears to be no different than for landowners.

Finally, even if the Court somehow determines that Plaintiffs do not have vested rights to use the Properties as adult entertainment establishments with nude dancing, alcohol service and booths, Plaintiffs still have a vested right to use the Properties as a restaurant with on-premise alcohol sale and consumption or some other commercial use. In reliance on Defendants' agreements and assurances, Plaintiffs invested millions of dollars to purchase and renovate the properties for use as a commercial establishment with on-premise alcohol sale and consumption. As a result, they have a vested right to use the Properties in this manner.

**2. Defendants' conduct is not narrowly tailored to serve a compelling state interest.**

Where a fundamental right, such as property rights, is at stake, government conduct must be narrowly tailored to serve a compelling state interest. Old S. Duck Tours v. Mayor & Aldermen of City of Savannah, 272 Ga. 869, 872, 535 S.E.2d 751, 754 (2000). Because Defendants mistakenly concluded that Plaintiffs were not deprived of a fundamental property right, they incorrectly applied the rational basis test to Plaintiffs' due process claim. (Def.'s Br., 30-31.) Therefore, Defendants do not state any compelling state interest that they contend justifies their conduct against Plaintiffs. (Id. at 30-33.)

Whether Defendants' conduct was narrowly tailored involves questions of fact that are not properly decided on a motion to dismiss. Nonetheless, regardless

of the compelling state interest that Defendants may claim they were intending to accomplish, it seems impossible to conclude that Defendants' course of conduct over the last three years was "narrowly tailored".  Beginning in 2009, Defendants embarked on a mission to drive Plaintiffs out of business.  Defendants began their campaign against Plaintiffs by amending the Adult Entertainment Ordinance to, among other things, prohibit the sale or consumption of alcohol at businesses that offer nude dancing and ban the use of any booths at those establishments.  (Compl. ¶¶ 33-36.)  These were the only two businesses in the "City that fell into the wake of the new law.  Because the business premises, which were built in accordance with City-approved building plans, contained booths, Defendants refused to renew the Operators' adult entertainment licenses for 2011, thereby forcing the businesses to operate as bikini bars and substantially decreasing the value of the businesses and the Properties.  (Compl. ¶¶ 24, 28, 37, 38.)

Not satisfied that the Operators could no longer operate as adult entertainment establishments, the next step in Defendants' plan was to drive the Operators completely out of business and eliminate any value in the Properties.  In 2011, Defendants began selectively and aggressively enforcing the City's former Alcohol Code against the Operators and used the Police Department's investigation of a fight in the ladies room of one business to illegally seize

computer equipment and videotapes.   (Compl. ¶¶ 39-46.)   After the City purportedly found evidence of unlawful conduct at the business premises, it passed an ordinance giving itself the power to suspend or revoke City-issued licenses where the City learned of unlawful conduct of unlawful conduct.  (Compl. ¶¶ 47, 48.)   The City then used this new law to revoke the Operators' business and alcohol licenses.  (Compl. ¶¶ 51-55.)  On the same day that the City revoked the Operators' licenses, Defendants amended the City licensing laws again to add grounds for non-renewing licenses if the applicant had any license revoked in the last 12 months or if the City had evidence that the applicant allowed unlawful activity at the business premises.  (Compl. ¶¶ 58.)  Ultimately, Defendants, through discriminatory application of its licensing law, denied the Operators' applications to renew their business licenses for 2012 and forced the businesses to close. (Compl. ¶¶ 60-75.)

As shown above, Plaintiffs satisfied their burden to allege a substantive due process claim under Georgia law.  The Property Owners and Operators have vested rights to use the Properties as adult entertainment establishments or as restaurants with alcohol service or, at the least, for some commercial purpose.  Therefore, contrary to Defendants' argument, Defendants deprived Plaintiffs of a fundamental right under Georgia law.  Because Defendants deprived Plaintiffs of a fundamental

right, the proper test for Plaintiffs' substantive due process claim is whether Defendants' conduct was narrowly tailored to serve a compelling state interest. Application of this test involves questions of fact and, therefore, is not appropriate for a motion to dismiss. That said, it strains credulity to believe that Defendants' no-holds-barred approach to running Plaintiffs out of the City was "narrowly tailored" to meet any legitimate government interest.

**F.      Plaintiffs Adequately Plead a Federal Procedural Due Process Claim.**

The Fourteenth Amendment provides that no state shall deprive "any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. To state a federal procedural due process claim, a plaintiff must allege: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." <u>Grayden v. Rhodes</u>, 345 F.3d 1225, 1232 (11th Cir.2003). Defendants contend that Plaintiffs did not adequately plead the first and third elements. (Def.'s Br., 40.) Defendants are wrong. Paragraphs 90-91 and 93-94 of the Complaint allege deprivation of Plaintiffs' property and sufficient facts from which the Court may reasonably infer that Defendants' so called "process" deprived Plaintiffs of their constitutional rights. (Compl. ¶¶ 70-72, 90-94.) Nonetheless, out of an abundance of caution, Plaintiffs' Amended Complaint specifically alleges that Defendants deprived them of

property rights within the complaint's procedural due process portion and alleges facts showing that Defendants' procedure was fundamentally unfair and, therefore, constitutionally inadequate.  (Am. Compl. ¶¶ 116-127.)

## 1.    Defendants deprived Plaintiffs of a protected property interest.

### a.  Plaintiffs have vested rights in the Properties.

As shown above, because Plaintiffs changed their position and made substantial investments in reliance on City zoning ordinances and Defendants' agreements and assurances that the Operators could use the Properties as adult entertainment establishments with alcohol service and booths, Plaintiffs have vested rights to use the Properties in that manner.  Even if Plaintiffs do not have a right to use the Properties as adult entertainment establishments, based on Defendants' agreements and assurances, Plaintiffs have the right to use the properties as restaurants with on-premise alcohol sales and consumption.  The Defendants deprived Plaintiffs of all such uses and all value in the Propeties.

### b.    Defendants deprived Plaintiffs of their vested use rights.

Defendants' conduct deprived Plaintiffs of their rights to use the Properties as adult entertainment establishments with nude dancing, alcohol service and booths.  Defendants also deprived Plaintiffs of their rights to use the Properties for any business whatsoever.  Defendants amended the City's Adult Entertainment

Ordinance and licensing requirements and then used the amended laws to non-renew the Operators' adult entertainment and business licenses, with the effect of shutting down those businesses.

Defendants contend that Plaintiffs have not been deprived of a property interest because they do not have a property interest in the licenses.  (Def.'s Br. 41.)  This argument misconstrues Plaintiffs' claims.  Plaintiffs do not allege that they were denied procedural due process based on a property interest in the licenses.  Rather, Defendants used the non-renewal of Plaintiffs' licenses as a means to deprive them of their vested use rights in the Properties and all value in the Properties.

### 2. Plaintiffs were not provided constitutionally adequate process.

"The basic requirement of constitutional due process is a fair and impartial tribunal, whether at the hands of a court, an administrative agency or a government hearing officer."  Valley v. Rapides Parish School Bd., 118 F.3d 1047, 1052 (5th Cir. 1997) (citing Gibson v. Berryhill, 411 U.S. 564, 569, 93 S.Ct. 1689, 1693, 36 L.Ed2d 488 (1973)).   Because of the high probability of actual bias on the part of the decision maker, certain situations are constitutionally intolerable.  Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975).   Such

situations include those in which the adjudicator has been the target of personal abuse or criticism from the party before him.  Id.

Here, as one example, the process that resulted in the Business Licenses' revocation and non-renewal and subsequent closing of the Businesses was a sham. At the hearings that led to the revocation of the Operators' alcohol and business licenses (the "Show Cause Hearings"), the hearing officer considered all documents and evidence presented to him, including illegally seized videotapes and unreliable testimony from unlicensed investigators.  (Compl. ¶¶ 52-54.)  When it came time for the renewal of these licenses, the City finance director relied on evidence in the transcripts of those revocation hearings and orders as grounds for non-renewing the Business Licenses, thus incorporating the unreliable evidence into his decision as well.  (Compl. ¶ 69.)  City manager, John Parker, added another layer of shoddy process by affirming the non-renewal in a kangaroo court appeal hearing of his own.

Mr. Parker's decision to affirm the non-renewals was inherently biased.  In March 2011, Plaintiffs filed a lawsuit against Mr. Parker in his official capacity and individually.  (Am. Compl. ¶ 123.)  In that action, Plaintiffs sought in excess of $70,000,000 in compensatory damages and $50,000,000 in punitive damages from the defendants, including Mr. Parker. (Am. Compl. ¶ 123.)  Aware of his own

bias, Mr. Parker recused himself from conducting the Show Cause Hearings concerning the license revocations, but still sat as the arbiter for the non-renewal process.  (Compl. ¶ 49, 70-73.)  During the non-renewal hearing, Mr. Parker's bias became even more obvious when he assumed dual roles of witness for the City as well as arbiter.   He even went so far as to take legal advice from the City Attorney/prosecutor openly during the hearing.  (Compl. ¶¶ 71, 72.)  Pursuant to Withrow, Mr. Parker's role as arbiter of the non-renewal decision is constitutionally intolerable and deprived Plaintiffs of procedural due process.  To the extent that Defendants claim that the process was unbiased, such claim is a question of fact that is not properly resolved at the motion to dismiss stage.

Plaintiffs' allegations, taken as true, show that Defendants' conduct deprived Plaintiffs of procedural due process.  Plaintiffs concurrently have a procedural due process claim pending in State court.  (Def's. Br., 41.)  To the extent, if any, that this Court determines that Plaintiffs' procedural due process claim is not yet ripe, Plaintiffs ask the Court to stay further proceedings on this claim pending adjudication of the issue in State court.

## G.    The Complaint States a Georgia Procedural Due Process Claim.

Georgia law recognizes that procedural due process may not be satisfied by mere notice and an opportunity to be heard.  See e.g., Vansant v. Cobb County

Police Dep't., 151 Ga. App. 220, 259 S.E.2d 205 (1979) (considering whether procedural due process was denied as a result of bias).  As noted by the Georgia Supreme Court, "[f]undamental fairness is 'the touchstone of due process.'" Meadows v. Settles, 274 Ga. 858, 860, 561 S.E.2d 105, 108 (2002) (quoting Gagnon v. Scarpelli, 411 U.S. 778, 790, 93 S.Ct. 1756, 1763 (1973).  "Whether or not one is deprived of the fundamental right to a fair hearing depends upon the facts of each case." Vansant, 151 Ga. App. at 220, 259 S.E.2d at 206.

Defendants' argument that Plaintiffs did not state a due process claim because they do not have property rights in the Business Licenses once again mischaracterizes Plaintiffs' claim.   As explained above, Plaintiffs base their procedural due process claims on the deprivation of their vested rights in the Properties.  As Defendants deprived Plaintiffs of their vested use rights through the fundamentally unfair and biased process that resulted in the license non-renewals described immediately above, Defendants deprived Plaintiff's of their procedural due process rights under Georgia law.

Although the allegations in the Complaint are sufficient to state a procedural due process claim, Plaintiffs' Amended Complaint cures any alleged defects.  The Amended Complaint specifically alleges that Defendants deprived them of property rights within the procedural due process portion of the complaint and

alleges facts to show that the procedure used to deny Plaintiffs' property rights was fundamentally unfair and, therefore, constitutionally inadequate.  (Am. Compl. ¶¶ 167-181.)

### H.    Plaintiffs Alleged a Valid Federal Takings Claim that is not Precluded by Res Judicata.

#### 1.  Defendants' conduct constitutes a taking.

The Fifth Amendment guarantees that private property shall not "be taken for public use, without just compensation."   U.S. Const. amend. V.   A compensable taking occurs when government compels a property owner to suffer a physical invasion of his property.   Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).   A compensable taking also occurs when government regulation denies an owner all economically viable use of his land.   Lucas v. S. Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).  In addition, a regulation on land that does not eliminate all economically beneficial use may constitute a taking "depending on a complex of factors including the regulation's economic effect on the property owner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action."   Palazzolo v. Rhode Island, 533 U.S. 606, 617, 131 S.Ct. 2448, 2457 (citing Penn Central

Transp. Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646 (1978)).  Plaintiffs'

Complaint states a claim that satisfies both tests.

### a. The regulations at issue deprived the Property Owners of all economically viable use of their property.

The Complaint alleges that Defendants, acting under color of law, enacted

and enforced regulations that deprived the Property Owners all economically

viable use of their property.  (Compl. ¶¶ 78, 110.)  Specifically, the Complaint

alleges that in reliance on certain agreements with, and assurances by, the City, the

Property Owners purchased the Properties for use by the Operators as adult

entertainment establishments with nude dancing, alcohol service and open booths.

(Compl. ¶¶ 22-23, 26-27.)  After the Property Owners purchased the Properties,

Defendants revised the City's Adult Entertainment Ordinance to prohibit the sale

or consumption of alcohol at businesses that offered nude dancing and also banned

the use of private booths at such establishments.  (Compl. ¶¶ 33, 36.)  Therefore,

the Operators began operating as bikini bars.  (Compl. ¶ 37.)

After the Businesses started operating as bikini bars, Defendants went on a

witch hunt to amass "evidence" against the Businesses in which the City illegally

seized evidence from Crazy Horse and used illegal, unlicensed investigators to find

or create evidence of unlawful conduct at the Businesses.  (Compl. ¶¶ 39-46, 54.)

The City then enacted multiple amendments to its licensing laws specifically

designed to use the illegal evidence as grounds for revoking and non-renewing the Operators' alcohol and business licenses.  (Compl. ¶¶ 47-50, 57-59.)  As a result of the City's regulation, the Operators ceased operating on January 15, 2012. (Compl. ¶ 75.)  By regulating the Operators out of business, Defendants denied the Property Owners all economically viable use of the Properties without just compensation.  (Compl. ¶ 110.)

There can be no dispute that the Complaint alleges that Defendants regulated the Operators out of business and that such regulation deprived the Property Owners of all economically viable use of their property. (Compl. ¶¶ 161, 189.) Pursuant to Lucas v. S. Carolina Coast Council, such allegations satisfy the requirements of pleading a regulatory taking under the Fifth Amendment.

Notwithstanding the clear allegations in the Complaint, Defendants make the baffling claim that "plaintiffs have not alleged that they have been deprived of all use of the subject property, or that they have been denied any economically viable use of the land."  (Def.'s Br., 38.)  Although this allegation clearly lacks merit, Plaintiffs, in an abundance of caution, are filing an Amended Complaint contemporaneously herewith that unequivocally states that "[g]iven the location and history of the Properties, the Properties have no value other than for use as adult entertainment establishments or bikini bars as previously operated at those

locations. As a result of Defendants' conduct, the Properties now have no viable economic use."  (Am. Compl. ¶¶ 161-62.)

### b. The regulations at issue substantially interfere with the Property Owners' reasonable investment-backed expectations.

A taking may also occur when a regulation on land interferes with reasonable investment-backed expectations.  Penn Central Trans. Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646 (1978).  Under the Penn Central test, whether a regulation constitutes a taking depends on a number of factors including the regulation's economic effect on the property owner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action.  Id.

In addition to satisfying the requirements of a taking under Lucas, the Complaint alleges a taking under Penn Central.  As alleged in the Complaint, Defendants' conduct undermined the Property Owners' ability to use the Properties for their intended purpose.  (Compl. ¶¶ 103, 105.) The Property Owners' purchased the Properties in reliance on City agreements and zoning verifications assuring the Property Owners that the Operators would be able to operate the Properties as adult entertainment establishments with alcohol service and booths.  (Compl. ¶¶ 23, 27.) Thereafter, in reliance on City-issued building permits, the Property Owners made substantial investments to improve the Properties.  (Compl. ¶¶ 25, 29.)  That is, the

Property Owners, in good faith, substantially changed their position with respect to the Properties and expended substantial sums to use the Properties as adult entertainment establishments with nude dancing, alcohol service and booths. Thus, they had a reasonable investment-backed expectation that the Properties could be used in this manner.

Defendants' conduct interfered with the Property Owners' reasonable investment-backed expectation that the Operators could use the Properties as adult entertainment establishments with alcohol service and booths. Under <u>Penn Central</u> and <u>Palazzolo</u>, such interference may constitute a taking. Accordingly, even if the Court finds that Defendants' did not deprive the Property Owners of all economically viable use of the Properties, Property Owners still stated a claim for a regulatory taking.

### 3.    Plaintiffs' Federal Takings Claim is not barred by res judicata.

This Court looks to Georgia law to determine if Plaintiffs' takings claim is precluded. <u>See</u> <u>Kizzire v. Baptist Health Sys., Inc.</u>, 441 F.3d 1306, 1308 (11th Cir. 2006). Under Georgia law, res judicata prevents re-litigation of claims already adjudicated between identical parties or their privies in identical causes of action. <u>Osborne v. City of Marietta, Ga.</u>, 380 Fed.Appx. 836, 837 (11th Cir. 2010). "Res judicata applies when a claim involves (1) the same the cause of action, (2) the

same parties or their privies, and (3) a previous adjudication on the merits by a court of competent [jurisdiction]." Id.

The Property Owners were not parties to the 2011 Writ Petitions.  One writ petition was filed by Jack Galardi and Mia Luna.  The other was filed by Jack Galardi and Red Eyed.  That is, the Operators brought the 2011 Writ Petitions after the City denied their adult entertainment licenses.  The Property Owners did not hold the licenses and, therefore, did not have standing to challenge the City's decisions.  To justify their res judicata argument, Defendants incorrectly assert that the Property Owners are "clearly" privies of the Operators. (Def.'s Br., 19.) Tellingly, Defendants do not cite any factual or legal basis for this claim.  (Id.)   In any event, whether the Property Owners are privies of the Operators involves questions of fact that may not be resolved on the pleadings at this stage.

Furthermore, the 2011 Writ Petitions did not involve a takings claim. The 2011 Writ Petitions were brought to challenge the denial of the Operators' adult entertainment licenses.  The petitioners in the 2011 Writ Petitions did not even have standing to raise a takings claim on behalf of the Property Owners. Moreover, most of the facts supporting the takings claim had not yet occurred. Thus, the issue in the 2011 Writ Petitions is not the same as in the present case.  As

there is no identity of parties or issues between the 2011 Writ Petitions and the present takings claim, res judicata does not apply.

### 4. The Court should reserve ruling on the Federal Takings Claim pending adjudication of the Takings Action.

"[A] federal compensation claim is not ripe until the plaintiff has unsuccessfully pursued a compensation claim in state court." Agripost, LLC v. Miami-Dade County, Fla., 525 F.3d 1049, 1052 (11th Cir. 2008). A plaintiff who involuntarily litigates in state court to satisfy this ripeness requirement can make an express reservation of his takings clause claim as an exception to state law claim preclusion principles. Id. The Eleventh Circuit recognizes such a reservation of rights, often referred to as a "Jennings Reservation." Id. at 1054-55. In light of this right, a federal district court may properly leave a federal takings claim open pending adjudication of the issue in state court. BFI Waste Systems of N. Am. v. DeKalb County, Ga., 303 F.Supp.2d 1335, 1348-49 (N.D. Ga. 2004).

On March 27, 2012, the Property Owners commenced an action in the Superior Court of Clayton County (the "Takings Action") to adjudicate their inverse condemnation claim. (A copy of the complaint in the Takings Action is attached hereto as Exhibit A.) The Takings Action includes a Jennings Reservation. (Ex. A at ¶ 75.) Pursuant to BFI Waste, this Court should stay

proceedings in and reserve its ruling on the Property Owners' federal takings claim in this matter pending adjudication of the Takings Action.

## I.   Plaintiffs Stated Actionable Claims Against the Individual Defendants.

### 1.   Georgia law provides for liability for conduct undertaken with malice or without authority of law.

Georgia law holds city council members "personally liable to one who sustains special damages as a result of any official act of such officers if done oppressively, maliciously, corruptly, or without authority of law." O.C.G.A. § 36-33-4. Thus, by the plain meaning of the statute, city counsel members are liable for damages where they act either: (1) oppressively, maliciously or corruptly; or (2) without authority of law. The allegations in the Complaint sufficiently plead both grounds for individual liability under O.C.G.A. § 36-33-4.

### a. The Complaint alleges that the individual Defendants acted oppressively, maliciously and corruptly.

It is difficult to see how the individual Defendants' conduct toward Plaintiffs could be described as anything other than oppressive, malicious and corrupt. As alleged in the Complaint, the individual Defendants undertook a three-year course of conduct with the sole purpose of eradicating the Businesses. The Complaint specifically alleges that the Mayor and City council members acted oppressively, maliciously and corruptly in passing a series of ordinances designed to shut down

the Businesses. (Compl. ¶¶ 175-76.)  The Complaint further alleges that Defendant Parker acted oppressively, maliciously and corruptly in determining the need for the Show Cause Hearings and in affirming the non-renewal of the Business Licenses.  (Compl. ¶¶ 177-78.)  The Complaint also alleges that the individual Defendants acted oppressively, maliciously and corruptly in directing the City Chief of Police to unfairly and selectively pursue Plaintiffs without regard to their civil rights in and effort to run them out of town. (Compl. ¶ 175.)  The individual defendants acted maliciously in directing the City Finance Director to non-renew the Operators' adult entertainment and business licenses. (Compl. ¶ 182.) Importantly, the Complaint alleges that Plaintiffs suffered and continue to suffer special damages as a result of the individual Defendants' oppressive, malicious and corrupt conduct.  (Compl. ¶ 184.)  Taken as true, these allegations state an actionable claim against the individual Defendants.

> **b. Taken as true, the allegations in the Complaint show that the individual Defendants acted outside the scope of their authority.**

The Complaint alleges that Plaintiffs suffered special damages as a result of the individual Defendants' conduct that was beyond the scope of their authority. Specifically, the Complaint alleges that the individual Defendants acted outside the scope of their authority by: (1) directing and/or ordering City police to target the Businesses and their customers for selective aggressive enforcement of the City's

former alcohol code (Compl. ¶ 180); (2) directing the City Finance Director to non-renew the Operators' adult entertainment licenses (Compl. ¶ 181); and (3) directing the City Finance Director to non-renew the Business Licenses (Compl. ¶ 181). Furthermore, the Complaint alleges that Plaintiffs suffered and continue to suffer special damages as a result of the individual Defendants' unauthorized conduct. (Compl. ¶ 184.) These allegations state an actionable claim against the individual Defendants.

### 2. The individual Defendants are not entitled to dismissal based on legislative immunity.

Members of a legislative body are not automatically protected by legislative immunity for all official conduct. Crymes v. DeKalb County, Georgia, 923 F.2d 1482, 1485 (11th Cir. 1991). "[I]t is the official *function* that determines the degree of immunity required, not the *status* of the acting officer." Crymes, 923 F.2d at 1485 (quoting Espanola Way Corp. v. Meyerson, 690 F/2d 827, 829 (11th Cir. 1982)(emphasis in original). Thus, legislative immunity does not apply to non-legislative conduct. Id.

The individual Defendants' claim of legislative immunity does not shield them from liability in this case. First, and most notably, Defendant Parker is not part of any legislative body. Second, the Complaint alleges liability against the individual Defendants for non-legislative conduct. In particular, the Complaint

seeks damages from the individual Defendants for their non-legislative conduct including: (1) directing and/or ordering City police to target the businesses and their customers for selective aggressive enforcement of the alcohol code, the Adult Entertainment Ordinance, public indecency laws and drunk driving laws (Compl. ¶ 179); (2) directing and/or ordering the Chief of Police to non-renew the Operators' adult entertainment licenses (Compl. ¶ 180); and (3) directing and/or ordering the City Finance Director to non-renew the Business Licenses (Compl. ¶ 181).  Such conduct is not protected by legislative immunity.

### 3.    The individual Defendants are not entitled to dismissal based on qualified immunity.

"Government officials enjoy qualified immunity from liability under 42 U.S.C. § 1983 unless their conduct violated 'clearly established constitutional rights of which a reasonable person would have known.'"  Cathy's Tap, Inc. v. Village of Mapleton, 65 F.Supp.2d 874, 893 (C.D. Ill. 1999)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  "To receive qualified immunity, the public official 'must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"  Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)(quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).  "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the

plaintiff to show that qualified immunity is not appropriate." Id.  There is a two-part test for this analysis.  Id.  First, the court must determine whether the plaintiff's allegations, if true, constitute a constitutional violation.  Id.  If so, the court must determine whether the right was clearly established.  Id.  In this regard, a constitutional right is clearly established if "its contours are sufficiently clear that a reasonable official would understand what he is doing violates that right." McDaniel v. Yearwood, No. 2:11-CV-00165-RWS, 2012 WL 526078 at *6 (N.D. Ga. Feb. 16, 2012).

### a. Qualified immunity does not apply to state law claims.

Qualified immunity is a federal law doctrine that applies only to federal law claims.  See Cathy's Tap, 65 F.Supp.2d at 893.  Thus, qualified immunity cannot protect the individual Defendants from liability for Plaintiffs' state law claims.

### b. Qualified immunity does not apply to conduct outside the scope of the individual Defendants' authority.

As noted above, Plaintiffs seek to hold the individual Defendants personally liable for conduct outside the scope of their authority.  Such conduct includes: (1) directing and/or ordering City police to target the businesses and their customers for selective aggressive enforcement of the alcohol code, the Adult Entertainment Ordinance, public indecency laws and drunk driving laws; (2) directing and/or ordering the Chief of Police to non-renew the Operators' adult entertainment

licenses; and (3) directing and/or ordering the City Finance Director to non-renew the Business Licenses.   Defendants cannot hide behind qualified immunity to protect it from liability for such unofficial conduct.

### c. The individual Defendants are not entitled to qualified immunity because they violated Plaintiffs' clearly established constitutional rights.

As explained above, Plaintiffs' allegations, taken as true, demonstrate that the individual Defendants violated Plaintiffs' equal protection rights, their property rights under the Fifth Amendment, and their Fourteenth Amendment due process rights.   Accordingly, Plaintiffs satisfy the first prong of the test to show that qualified immunity does not apply.

Plaintiffs also satisfied the second prong of the test to deny the individual Defendants qualified immunity because the rights Defendants violated are clearly established.

### i.  Equal Protection Claim

Relevant case law plainly establishes that individuals have a right to be free from intentional discrimination at the hands of government officials.   See, e.g., Campbell v. Rainbow City, Alabama, 434 F.3d 1306 (11th Cir. 2006).   A reasonable official would understand that passing laws targeting certain individuals and causing certain laws to be applied differently to those individuals than to

others would violate the constitutional guarantee of equal protection.  Thus, the individual Defendants do not have qualified immunity from Plaintiffs' federal equal protection claim.

### ii.  Takings Claim

It is clearly established that a compensable taking occurs when government regulation denies an owner all economically viable use of his land.  <u>See</u>, <u>e.g.</u>, <u>Lucas v. S. Carolina Coastal Council</u>, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).  In this case, Plaintiffs allege that the individual Defendants violated Plaintiffs' Fifth Amendment right by engaging in a course of conduct that deprived the Property Owners of all economically viable use of their property without just compensation.  A reasonable official would know that depriving a Property Owner of all economically viable use of his property without just compensation violates the Takings Clause of the Fifth Amendment.

### iii. Procedural Due Process Claim

Finally, a reasonable official would recognize that the individual Defendants' conduct violated Plaintiffs' due process rights.  As shown in Section III.E.1, above, Plaintiffs' acquired vested rights to use the Properties as adult entertainment establishments with nude dancing, alcohol service and booths or, at the least, to use the Properties as restaurants with on-premise alcohol sale and

consumption.  The individual Defendants deprived Plaintiffs of their use rights in the Properties through a biased process that was fundamentally unfair.  Qualified immunity does not apply to protect the individual Defendants from their clear violation of Plaintiffs' due process rights.

### 4.     The individual Defendants are not shielded by official immunity.

The doctrine of official immunity provides that a public official shall not be personally liable for discretionary acts unless such acts are willful, wanton or outside the scope of his authority.  Schulze v. DeKalb County, 230 Ga. App. 305, 307-08, 496 S.E.2d 273 (1998).  In this case, the individual Defendants are not entitled to official immunity because, as set forth in more detail in sections III.J.1 and III.J.3, above, Plaintiffs allege harm as a result of Defendants' malicious conduct that was outside the scope of Defendants' scope of authority.  Therefore, the individual Defendants are not entitled to official immunity.

### 5.     Statutory immunity is unavailable to the individual Defendants.

Georgia law provides for statutory immunity in certain limited cases.  Under Georgia law:

> A person serving with or without compensation as a member, director, or trustee, or as an officer of the board, *without compensation* . . . of any local governmental agency, board, authority, or entity shall be immune from civil liability for any act or omission to act arising out of such service if such person was acting in good faith within the scope of his or her official actions and duties and unless the damage

or injury was caused by the willful or wanton misconduct of such person.

O.C.G.A. § 51-1-20(a)(emphasis added).

The individual Defendants cannot reasonably claim statutory immunity in this case.  First, to assert this defense, the individual Defendants must show that they served in their official capacity without compensation.  They have not done so.  In addition, the individual Defendants may claim statutory immunity only for actions taken "in good faith within the scope of his or her official actions and duties . . . ."  O.C.G.A. § 51-1-20(a).  Plaintiffs seek damages for conduct outside the scope of the individual Defendants' duties that was not in good faith.  By the plain terms of O.C.G.A. § 51-1-20(a), the individual Defendants cannot claim statutory immunity for such conduct.

## J.      Plaintiffs Clarify and Withdraw Certain Other Claims.

Plaintiffs hereby withdraw Count IV of the Complaint asking this Court to enter a declaratory judgment.  Plaintiffs also withdraw their claims against the individual Defendants in their <u>official</u> capacity.  Plaintiffs' withdrawal of these claims is reflected in the Amended Complaint filed contemporaneously herewith.  Plaintiffs clarify that they do not state any claims that rely solely on the City's former Alcohol Code and Defendants' revocation of the Business Licenses.

## IV.   CONCLUSION

Defendants' Motion to Dismiss mischaracterizes Plaintiffs' claims in the present litigation.  Defendants' discriminatory and malicious course of conduct deprived Plaintiffs of rights protected by the United States and Georgia Constitutions.  For the reasons set forth above, the Court should deny Defendants' Motion to Dismiss Plaintiffs' claims.

Respectfully submitted this 5th day of April, 2012.

/s/  Simon H. Bloom
Simon H. Bloom, III
Georgia Bar No. 064298
sbloom@bloom-law.com
Stephanie A. Everett
Georgia Bar No. 253075
severett@bloom-law.com
Sherri G. Buda
Georgia Bar No. 093399
sbuda@bloom-law.com

THE BLOOM LAW FIRM LLP
977 Ponce de Leon Ave. NE
Atlanta, Georgia 30306
Phone:  404-577-7710
Facsimile:  404-577-7715
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 5.IB</u>

Pursuant to Local Rule 7.1(D), N.D. Ga. L.R., I hereby certify that the foregoing pleading has been prepared using one of the font and point selections approved by the Court in Local Rule 5.1B, N.D. Ga. This document was prepared using Times New Roman 14 pt. font.

Respectfully submitted,

/s/ Simon H. Bloom
Simon H. Bloom, III
Georgia Bar No. 064298
sbloom@bloom-law.com
Stephanie A. Everett
Georgia Bar No. 253075
severett@bloom-law.com
Sherri G. Buda
Georgia Bar No. 093399
sbuda@bloom-law.com

THE BLOOM LAW FIRM LLP
977 Ponce de Leon Ave. NE
Atlanta, Georgia 30306
Phone: 404-577-7710
Facsimile: 404-577-7715
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of April, 2012, I electronically filed the

foregoing **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO**

**DISMISS** with the Clerk of Court using the CM/ECF system which will

automatically send email notification of such filing to the following attorneys of

record:

Dana K. Maine
dmaine@fmglaw.com
William J. Linkous
blinkous@fmglaw.com
**Freeman, Mathis & Gary, LLP**
100 Galleria Parkway, Suite 1600
Atlanta, Georgia 30339-5948

Robert L. Mack, Jr.
rlmack@mackandharris.com
Joe M. Harris, Jr.
jharris@mackandharris.com
**Mack & Harris, P.C.**
205 Corporate Center Drive, Suite B
Stockbridge, Georgia 30281

Respectfully submitted this 5th day of April 2012.

{00030134.DOCX /2 }

/s/  Simon H. Bloom
Simon H. Bloom, III
Georgia Bar No. 064298
sbloom@bloom-law.com
Stephanie A. Everett
Georgia Bar No. 253075
severett@bloom-law.com
Sherri G. Buda
Georgia Bar No. 093399
sbuda@bloom-law.com


THE BLOOM LAW FIRM LLP
977 Ponce de Leon Ave. NE
Atlanta, Georgia 30306
Phone:  404-577-7710
Facsimile:  404-577-7715
*Attorneys for Plaintiffs*